TRI-STATE TERMINALS, INC. and
Liberty Mutual Insurance
Company, Petitioners,

v.

Fred JESSE and Benefits Review Board,
United States Department of Labor, and
Director, Office of Workers' Compensa-
tion Programs, United States Depart-
ment of Labor, Respondents.

TRI-STATE TERMINALS, INC. and
Liberty Mutual Insurance
Company, Petitioners,

v.

George BARBER and Benefits Review
Board, United States Department of La-
bor, and Director, Office of Workers'
Compensation Programs, United States
Department of Labor, Respondents.

Nos. 78-1014, 78-1816.

United States Court of Appeals,
Seventh Circuit.

Heard Dec. 4, 1978.

Decided April 18, 1979.

LAY, Circuit Judge.

Tri-State Terminals, Inc. has filed separate petitions for review from two decisions ·of the Benefits Review Board, United States Department of Labor, which granted claimants Barber and Jesse compensation for injuries suffered while working as longshoremen. Tri-State concedes that claimants suffered work-related injuries compensable under the Longshoremen's and Harbor Workers' Compensation Act, but challenges the Board's method of computing compensation. The sole issue raised by this appeal is whether Section 10(c) of the Act, 33 U.S.C. § 910(c), permits the computation of disability benefits to be based in part on the post-injury earnings of claimants' co-employees.

George Barber and Fred Jesse worked for Tri-State Terminals, Inc. as longshoremen at Burns Harbor, Indiana. The port facility at Burns Harbor commenced operation in 1970, and since 1972 all general stevedoring work has been done by Tri-State. Each year the volume of work at the port has increased substantially. Due to the ice conditions in the St. Lawrence Seaway and the Great Lakes, Burns Harbor is only open for approximately 30 weeks of the year—from mid-April until December. On May 10, 1974, claimant Barber suffered a compensable employment-related injury. As a result, he was temporarily totally disabled. Pursuant to the Act, a claim for compensation was filed. A formal hearing before an administrative law judge (ALJ) was held, and, because of the intermittent and discontinuous nature of the longshore work at Burns Harbor, § 10(c) of the Act was employed to compute the compensation rate.

The Longshoremen's Act provides that the amount of weekly disability compensation payable for a temporary total disability shall be based on the average weekly wage of the injured employee. The average weekly wage is to be determined by dividing the claimant's average annual earning capacity by 52. *See* 33 U.S.C. §§ 908(b),

Timothy J. Walsh, South Bend, Ind., for petitioners.

Mark C. Walters, Dept. of Labor, Washington, D. C., for respondents.

Before CUMMINGS, LAY * and WOOD, Circuit Judges.

* The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, is sitting by designation.

910(c) and (d). During the 52 weeks preceding his injury, claimant's wages from his longshore employment totalled $2,758.74. The ALJ used this amount to compute claimant's average weekly wage, and, in turn, to fix the amount awarded in the compensation order. Both the employer and claimant appealed this decision to the Benefits Review Board.

The Board, although agreeing that § 10(c) applied, reversed the ALJ's order and held, *inter alia*, that the continuing rapid development of Burns Harbor and the corresponding increase in work opportunities should be considered in computing claimant's average annual earnings. In concluding that the ALJ erred in focusing entirely on claimant's preinjury earnings, the Board stated: "[T]he administrative law judge should consider not only claimant's previous actual earnings during the 1973 season, but *the amount which he reasonably would have earned in 1974 were it not for the injury.* . . ." *George Barber*, BRB Nos. 75–177 & 75–177A at 8 (Feb. 25, 1976) (emphasis added).

On remand the ALJ found claimant's co-employees earned approximately three times more during the 1974 shipping season than they earned in the previous season. The new compensation order was accordingly determined in part by multiplying claimant's previous earnings by three. On appeal the Board modified the resulting compensation order but affirmed the ALJ's determination that claimant's average annual earning capacity could be computed by examining the post-injury earnings of claimant's co-employees. To arrive at claimant's average weekly wage the Board multiplied claimant's prior earnings by three and divided the product by 52 ($2,758.74 × 3 = $8,277.00 ÷ 52 = $159.17). *George Barber*,

BRB Nos. 77–801, 77–801A & 77–801B (May 31, 1978).

Claimant Jesse sustained an employment-related injury on November 8, 1973, which resulted in temporary total disability and permanent partial disability. In computing the appropriate amount of compensation payments due the claimant, the ALJ relied on the Board's *George Barber* decision. The ALJ ascertained claimant's annual earning capacity in part by determining the average earnings of four similarly situated employees during 1974. On appeal the Board reaffirmed the decision in the *Barber* case, and stated:

> Because we believe the average 1974 earnings of the four similarly situated employees is more representative of the claimant's wage earning capacity, the claimant's annual earnings would be equal to $9,981.39. Properly computed, claimant's average weekly wage is equal to $9,981.39 divided by 52, or, $191.95.

*Fred Jesse*, BRB Nos. 76–448, 76–448A & 76–448B at 5 (Dec. 20, 1977). The Board likewise concluded that $191.95 represented claimant's average weekly wage for purposes of computing compensation for the permanent partial disability. *See* 33 U.S.C. §§ 908(c)(21) and (h).

On these consolidated appeals Tri-State seeks reversal of the Board's method of implementing § 10(c), and contends that the statutory language, federal case law and the policy underlying the Act preclude consideration of circumstances existing subsequent to the date of injury.

Three methods for determining average annual earnings are contained in § 10. *See* 33 U.S.C. §§ 910(a), (b) and (c). Sections 10(a) and (b) generally apply if the claimant is a full-time employee.[1] However, where

1. Sections 10(a) and (b) read as follows:
    (a) If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary for a six-day worker and two hundred and sixty times the

average daily wage or salary for a five-day worker, which he shall have earned in such employment during the days when so employed.
    (b) If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day work-

the work is discontinuous and intermittent, as it was at Burns Harbor for both employees, all parties agree that § 10(c) provides the appropriate method for calculating average annual earnings. *See White v. O'Hearne,* 338 F.2d 464, 466 (4th Cir. 1964), *cert. denied,* 380 U.S. 973, 85 S.Ct. 1331, 14 L.Ed.2d 269 (1965); *Johnson v. Britton,* 110 U.S.App.D.C. 164, 165–68, 290 F.2d 355, 356–59, *cert. denied,* 368 U.S. 859, 82 S.Ct. 99, 7 L.Ed.2d 56 (1961); *Marshall v. Andrew F. Mahony Co.,* 56 F.2d 74, 78 (9th Cir. 1932); S.Rep.No.1315, 80th Cong., 2d Sess., *reprinted in* [1948] U.S.Code Cong.Serv. pp. 1979, 1982. Section 10(c) provides:

> If either of the foregoing methods of arriving at the average annual earnings of the injured employee cannot reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee.

33 U.S.C. § 910(c).

In support of its contention that only preinjury earnings can be considered, Tri-State places primary emphasis upon the portion of § 10(c) which states that annual earning capacity shall be determined "having regard to the *previous earnings* of the injured employee [and his co-employees] in the employment in which he was working at the time of the injury . . . .." (Emphasis added.) Thus, Tri-State concludes that the literal terms of § 10(c) explicitly foreclose consideration of post-injury earnings.

■ Although the language of § 10(c) provides legislative direction regarding the nature of the inquiry, a normal reading of the phrase "having regard to" would mean only that the Board should take into consideration the enumerated factors. *See Fireman's Fund Insurance Co. v. Peterson,* 120 F.2d 547, 548 (9th Cir. 1941). In the instant cases the Board did precisely that. *Cf. Fireman's Fund Insurance Co. v. Van Steene,* 120 F.2d 548, 550 (9th Cir. 1941). However, Tri-State argues that the express mention of certain factors precludes consideration of factors not specifically enumerated. Use of the words "having regard to," however, which precede the factors set forth suggests that the maxim of *expressio unius est exclusio alterius* is not applicable in this instance.[2] *Cf. Pfizer Inc. v. Government of India,* 434 U.S. 308, 311–13, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978) *and Highway & City Freight Drivers, Local 600 v. Gordon Transports, Inc.,* 576 F.2d 1285, 1289 (8th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 612, 58 L.Ed.2d 678 (1978) (use of the word "includes" preceding an enunciated list does not imply exclusion of all others not listed). The ordinary understanding of "having regard to" does not connote exclusivity. A well-settled principle of statutory construction is that the language of a statute should be given its customary meaning unless a

---

er, two hundred and sixty times the average daily wage or salary, which an employee of the same class working substantially the whole of such immediately preceding year in the same or in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.

33 U.S.C. §§ 910(a) and (b).

2. The maxim *expressio unius est exclusio alterius* is premised on the assumption that the legislature considered and rejected all factors not listed. *See American Trucking Ass'ns v. United States,* 344 U.S. 298, 309–10, 73 S.Ct.

307, 97 L.Ed. 337 (1953); *National Petroleum Refiners Ass'n v. FTC,* 157 U.S.App.D.C. 83, 87, 482 F.2d 672, 676 (1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). The validity of this assumption in the instant case is highly questionable. The meager legislative history available fails to reveal whether Congress considered the possible effects of post-injury circumstances such as those presented in the instant cases. Congressional silence on the specific issue confronting this court is not surprising since the Board informs us that the present issue has been raised only in cases of injuries incurred in 1973–1974 at Burns Harbor.

more restricted interpretation is necessary to effectuate the purposes of the act being construed. *See, e. g., In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975); *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 465, 88 S.Ct. 1140, 20 L.Ed. 30 (1968) (construing Longshoremen's and Harbor Workers' Compensation Act). Adherence to this principle in the instant cases is particularly appropriate since the Longshoremen's Act is a remedial statute which should be liberally construed to effectuate its purposes and in a way to avoid "harsh and incongruous results." *See Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953); *Baltimore & Philadelphia Steamboat Co. v. Norton*, 284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed. 366 (1932); *Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 51 (2d Cir. 1976), aff'd sub nom. *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). Thus, we believe the ultimate inquiry is to determine the purpose of § 10(c).

The main clause of § 10(c) states that "average annual earnings shall be such sum as . . . shall reasonably represent the annual earning capacity of the injured employee." It is manifest that the prime objective of § 10(c) was to insure that compensation awards would be based on accurate assessments of the claimants' earning capacity. *See Johnson v. Britton*, 110 U.S.App.D.C. at 166–67, 290 F.2d at 357–58; *O'Hearne v. Maryland Casualty Co.*, 177 F.2d 979, 981–82 (4th Cir. 1949); *Fireman's Fund Insurance Co. v. Van Steene*, 120 F.2d at 550; S.Rep.No.1315, 80th Cong., 2d Sess., *reprinted in* [1948] U.S.Code Cong.Serv. pp. 1979, 1983.

Sections 10(a) and (b) provide explicit formulas for calculating "average annual earnings" which include only prior earnings in the previous employment. Nevertheless,

the fact that §§ 10(a) and (b) limit the computation of average annual earnings to prior earnings does not inexorably lead to the conclusion that § 10(c) implicitly contains a similar limitation. Sections 10(a) and (b) apply exclusively to claimants who are engaged in continuous, full-time employment, and their application therefore provides a realistic measure of the claimants' loss.[3] Even if a claimant is engaged in full-time employment, however, §§ 10(a) or (b) will not apply if they "can not reasonably and fairly be applied." 33 U.S.C. § 910(c). In such situations § 10(c) is to be applied even if it is " 'possible to force the transaction into the formulae which [§§ 10(a) and (b)] prescribe.' " *Johnson v. Britton*, 110 U.S.App.D.C. at 168, 290 F.2d at 359 *quoting Marshall v. Andrew F. Mahony Co.*, 56 F.2d at 78. Furthermore, and more importantly, Congress made a deliberate choice to use the phrase *"annual earning capacity"* in § 10(c) instead of *"daily wage or salary"* as used in §§ 10(a) and (b). Although § 10 does not define the phrase "earning capacity," its meaning is discussed in another section of the Longshoremen's Act, and has been frequently construed in other judicial decisions.

Section 8 defines "wage-earning capacity" as follows:

(h) The wage-earning capacity of an injured employee in cases of partial disability under subdivision (c)(21) of this section or under subdivision (e) of this section shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: Provided, however, That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his

---

**3.** One of the primary reasons for the differentiation in § 10(c) is that it would be unfair to the employer to calculate an intermittent employee's wage under §§ 10(a) or (b), since to do so would treat the claimant as a full-time worker

and thereby exaggerate his loss. *See Johnson v. Britton*, 110 U.S.App.D.C. at 166–67, 290 F.2d at 357–58; *Marshall v. Andrew F. Mahony Co.*, 56 F.2d at 77–78.

injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

33 U.S.C. § 908(h).

Although the definition contained in this section is not made applicable to § 10(c), "[t]he connotation of a term in one portion of an Act may often be clarified by reference to its use in others." *United States v. Cooper Corp.,* 312 U.S. 600, 606, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941). *Accord, United States v. Nunez,* 573 F.2d 769, 771 (2d Cir.), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978); *United States v. Gertz,* 249 F.2d 662, 665 (9th Cir. 1957); *Schooler v. United States,* 231 F.2d 560, 563 (8th Cir. 1956).

Several decisions construing "earning capacity," as used in § 10(c), have held it means the ability, willingness and opportunity to work. *See, e. g., Johnson v. Britton,* 110 U.S.App.D.C. at 167, 290 F.2d at 358; *Fireman's Fund Insurance Co. v. Van Steene,* 120 F.2d at 549; *Marshall v. Andrew F. Mahony Co.,* 56 F.2d at 78. In the instant cases, the Board found that the claimants' prior earnings did not reasonably reflect their earning capacity since their opportunities for work would have been substantially greater had they not been injured. In its decision of claimant Barber's case, the Board stated:

> The term "earning capacity" connotes the *potential* of the injured employee to earn and is not restricted to a determination based on previous actual earnings.

.     .     .     .     .

A compensation award under Section 10(c) may properly be based on the injured employee's actual earnings in the year preceding the injury if such actual earnings are a fair and reasonable approximation of claimant's earning capacity. Such was not the case here. The record reveals that claimant was a longshoreman at a rapidly developing port; that business had increased each year since its opening in 1970; that employees of similar experience and seniority as claimant had earned substantially more during the 1974 season than during the previous year; and that claimant was a dependable worker who would work whenever called. Under such circumstances, use of only claimants' previous actual earnings did not result in a fair approximation of his annual earning capacity as a longshoreman since the record establishes that, under normal conditions, claimant would have realized a substantial increase in earnings but for the disabling injury.

*George Barber,* BRB Nos. 75–177 & 75–177A at 6–7 (Feb. 25, 1976).

■■■ The Board's interpretation of § 10(c) thus construes earning capacity of the injured workman to mean the amount of earnings the claimant would have the potential and opportunity to earn absent injury.[4] We think they have done so correctly.[5] The purpose of the Longshoremen's Act is to provide minimal compensation to the injured worker during his disability. Just as it would be unfair to compute compensation for an intermittent worker on the basis of what he would have

---

4. *Compare Fireman's Fund Insurance Co. v. Van Steene,* 120 F.2d 548 (9th Cir. 1941). In that case the claimant was physically unable to work during a substantial portion of the year immediately preceding the injury which gave rise to his claim for compensation under the Longshoremen's Act. The claimant had recovered from his disability prior to his compensable injury and therefore the Deputy Commissioner computed claimant's earning capacity as if he were physically able to work. The court of appeals affirmed the award. Thus, earning capacity was determined by taking into consid-

eration that the claimant's ability to earn would have been greater in the year following injury than it was prior to the injury.

5. We agree with Judge Friendly's view that the Benefits Review Board is not a policy-making body and in the area of statutory interpretation the rule of deference to the agency's interpretation has little logical force. *See Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 48–49 (2d Cir. 1976), *aff'd sub nom. Northwest Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

earned as a full-time employee under §§ 10(a) or (b), it would work an equal injustice to compute loss of earning power on facts which do not realistically reflect it. Although the factual situation present in these appeals may not arise with great frequency, the Board was faced with the unusual situation where previous earnings of the employee or of other employees similarly situated did not provide a true, fair and realistic picture of average earning capacity of the individuals involved. We find neither the language of § 10(c) nor the legislative history[6] requires a more narrow application which would defeat an equitable determination of the earning capacity of the injured worker.[7] The fundamental issue is what period of time the Board may choose in determining the wage period for measuring earning capacity. Since the language

**6.** Tri-State argues that the legislative history surrounding the amendment of § 10(c) indicates that a claimant's annual earning capacity should be based solely on preinjury earnings. The pertinent portion of the Senate Labor and Public Welfare Committee's report, which Tri-State relies upon, reads:

> Subsection (c) of section 10 of the act would be amended by section 4 of the bill so as to permit the inclusion of all earnings of the injured employee to be taken into account in determining the employee's annual earning capacity. This subsection in the present law is used where the employment itself, in which the injured employee was engaged when injured, does not afford a full year of work. It is also used where the workweek is shorter than 6 days (and would be used where such workweek is also shorter than 5 days under the proposed amendment to this section). Thus subsection (c) applies to seasonal, intermittent, discontinuous, and like employment which affords less than a full workyear or workweek. Under the present law the employee's wage for computation purposes under subdivision (c) is limited to his actual earnings, and those of like employees, . . .
>
> The measurement of an employee's capacity to earn should not be limited to his earnings in the particular employment in which he was engaged when injured, but should be gaged by what the employee is capable of earning in all employments in which he was employed during the year prior to injury, otherwise harsh results necessarily follow. The proposed change in subsection (c) seeks to avoid such harsh results by permitting consideration of earnings of the employee not only in the employment engaged in when injured, but all other employments in which he worked during the year prior to injury, and is intended to be inclusive of the reasonable value of the employee's services if self-employed during part of such year.

S.Rep.No.1315, 80th Cong., 2d Sess., *reprinted in* [1948] U.S.Code Cong.Serv. pp. 1979, 1982–83.

The meager legislative history available is of limited value in resolving the instant dispute. It does indicate, however, that § 10(c) was amended to insure that compensation awards more accurately reflect a claimant's earning capacity by allowing the Board to consider "what the employee is capable of earning in all employments in which he was employed during the year prior to injury." In support of their respective interpretations of § 10(c), the Board emphasizes the phrase "what the employee *is capable of earning,*" while Tri-State stresses the language which reads "during the year *prior* to injury." U.S.Code Cong.Serv. 1948, p. 1983. Neither party, however, places primary reliance on the legislative history to vindicate their interpretations, and we find the legislative history inconclusive.

**7.** Tri-State urges that language contained in several federal cases suggests that only previous earnings may be considered. *See, e. g., Marshall v. Andrew F. Mahony Co.,* 56 F.2d at 77–78. While it is true that certain dicta contained in prior cases described the § 10(c) computation in terms of examining the claimant's previous actual earnings, there is no indication in any of those cases that the claimant had attempted to introduce evidence of post-injury circumstances. The court in the *Mahony Co.* case quoted with approval the lower court's finding that "[n]o abnormal condition or circumstance" was present which would make it unreasonable to base the compensation award on the claimant's prior actual earnings.

Examination of the decisions relied upon by Tri-State reveals that the issue addressed in those cases concerned *which* subsection of § 10 was applicable. *See, e. g., O'Hearne v. Maryland Casualty Co.,* 177 F.2d 979 (4th Cir. 1949) (§ 10(b) applied when claimant was engaged in a continuous employment at the time of injury even though his employment during the year preceding injury had been intermittent); *Marshall v. Andrew F. Mahony Co.,* 56 F.2d 74 (9th Cir. 1932) (§ 10(c) applied when claimant's employment was intermittent and discontinuous); *Pacific S. S. Co. v. Pillsbury,* 52 F.2d 686 (S.D.Cal.1931) (compensation award computed under § 10(b) was erroneous since no one in claimant's class held other than irregular employment). No other federal court has considered the precise question raised by this appeal regarding the scope of factors which may be considered when computing earning capacity under § 10(c).

of § 10(c) is not self-limiting as is the language of §§ 10(a) and (b), and where the overall efficacy and fairness of the Act would be drastically diminished by considering only the minimal earnings of the prior year, we feel the Board did not go beyond the scope of its statutory authority in making its factual determination of earning capacity.[8]

The final issue deals with the computation of compensation for claimant Jesse's permanent partial disability. Tri-State urges in its brief:

> The only way Jesse could have incurred a loss of wage earning capacity under Sections 8(c)(21) and 8(h) of the Act would be to continue to presuppose the validity of the Board's view that Jesse's average weekly wage at the time of injury was as high as $191.95.

> . . . . .

> Accordingly, the Board's decision is contrary to law because it relies upon an erroneous calculation of average weekly wage which wage is fundamental to the calculation and determination of permanent partial disability under Section 8.

Petitioners' Brief at 47–48.

Since we uphold the Board's method of calculating the average weekly wage, Tri-State's argument regarding permanent partial disability compensation fails.[9]

The Board's findings are affirmed, and the petitions for review in cases No. 78–1014 and No. 78–1816 are ordered dismissed.

---

8. Tri-State also argues that consideration of post-injury wages is entirely speculative. We find, however, the determinations of claimants' annual earning capacity supported by substantial evidence. Claimant Barber had proven himself readily available and he accepted work when offered. At the time of injury, claimant was fourteenth in seniority among longshoremen, and therefore, whenever work was available, the claimant was among the first group called. Claimant Jesse was third in seniority. Thus, the evidence in the record establishes that both claimants would have availed themselves of the increasing work opportunities were it not for their injuries.

9. Sections 8(c)(21) and (h) respectively read:
   (21) Other cases: In all other cases in this class of disability the compensation shall be 66⅔ per centum of the difference between his average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such impairment by the deputy commissioner on his own

motion or upon application of any party in interest.
   (h) The wage-earning capacity of an injured employee in cases of partial disability under subdivision (c)(21) of this section or under subdivision (e) of this section shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: Provided, however, That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.
33 U.S.C. §§ 908(c)(21) and (h).